No. 25-13660

In the

# United States Court of Appeals
## for the Eleventh Circuit

Terry Talley,

*Plaintiff-Appellee*,

v.

James G. Baker, as administrator of the Estate of Roy Lee Olinger, Jr.,

*Defendant-Appellant*.

On Appeal from the United States District Court for the Middle District of Georgia, Columbus Division.
No. 4:23-cv-32 — Clay D. Land, *Judge*

## BRIEF OF DEFENDANT-APPELLANT


Christopher M. Carr
*Attorney General of Georgia*

Stephen J. Petrany
*Solicitor General*

John Henry Thompson
*Director of Special Litigation*

Elijah O'Kelley
*Deputy Solicitor General*

Loretta L. Pinkston-Pope
*Deputy Attorney General*

William W. Peters
*Senior Asst. Attorney General*

Office of the Georgia Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3373
jhthompson@law.ga.gov
*Counsel for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant James G. Baker, as administrator of the Estate of Roy Lee Olinger, Jr., requests oral argument.[1] The district court denied qualified immunity and ruled that a reasonable jury could find Olinger liable under 42 U.S.C. § 1983 for violating and conspiring to violate Plaintiff-Appellee Terry Talley's rights under *Brady v. Maryland*, 373 U.S. 83 (1963). Doc. 130 at 22–23. Unlike a *Brady* claim in the criminal trial context, which "imposes a no-fault standard of care," a *Brady*-based § 1983 claim requires proof that a law-enforcement officer intentionally or recklessly caused exculpatory evidence to be withheld from the prosecutor. *Porter v. White*, 483 F.3d 1294, 1305 (11th Cir. 2007). Here, however, the district court addressed neither causation nor Olinger's mental state. Doc. 130 at 22–23. Oral argument would aid in correcting the court's erroneous understanding of a *Brady*-based § 1983 claim, and in explaining why Olinger is entitled to summary judgment under the correct legal standard.

---

[1] An unopposed motion to amend the style of this appeal is pending before this Court. CA11 Doc. 17. The correct party name for Defendant-Appellant is "James G. Baker, as administrator of the Estate of Roy Lee Olinger, Jr." *See id.* For ease of reference, this brief uses "Olinger" when referring to the target of Talley's claims for damages under 42 U.S.C. § 1983.

# TABLE OF CONTENTS

**Page**


Statement Regarding Oral Argument .......... i

Table of Authorities .......... iv

Jurisdiction .......... vii

Statement of Issues .......... 1

Introduction .......... 2

Statement of the Case .......... 5

A. Factual Background .......... 6

1. A series of rapes and attempted rapes occur in LaGrange. .......... 6

2. Georgia Bureau of Investigation agent Olinger assists with the late stages of the investigation. .......... 7

3. A jury convicts Talley in the MK and EM cases. .......... 12

4. Four of Talley's convictions are vacated. .......... 16

B. Proceedings Below .......... 17

C. Standard of Review .......... 20

Summary of Argument .......... 21

Argument .......... 24

I. Olinger is entitled to summary judgment on Talley's *Brady*-based § 1983 claim. .......... 25

A. Talley's § 1983 *Brady* claim fails as a matter of law, and qualified immunity bars liability in any event. .......... 28

B. The district court's contrary reasoning fails. .......... 35

**TABLE OF CONTENTS**
**(continued)**

**Page**

II. Olinger is entitled to summary judgment on Talley's § 1983 conspiracy claim.......... 45

III. If this Court affirms, it should clarify the narrow scope of Talley's surviving § 1983 claims.......... 48

Conclusion.......... 51

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aguirre v. Seminole Cnty.*,
158 F.4th 1276 (11th Cir. 2025) .......... 34, 39

*Alvarez v. City of Brownsville*,
904 F.3d 382 (5th Cir. 2018) .......... 49

*Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. City of Miami*,
637 F.3d 1178 (11th Cir. 2011) .......... 45, 46

*Arizona v. Youngblood*,
488 U.S. 51 (1988) .......... 27

*Bayse v. Ward*,
147 F.4th 1304 (11th Cir. 2025) .......... 20, 30, 42

*Brady v. Maryland*,
373 U.S. 83 (1963) .......... 3, 25

*Burnette v. Taylor*,
533 F.3d 1325 (11th Cir. 2008) .......... 47

*Cordoba v. Dillard's, Inc.*,
419 F.3d 1169 (11th Cir. 2005) .......... 43

*Corey Airport Servs., Inc. v. Decosta*,
587 F.3d 1280 (11th Cir. 2009) .......... 45

*Daniels v. Williams*,
474 U.S. 327 (1986) .......... 27

*Freeman v. State of Ga.*,
599 F.2d 65 (5th Cir. 1979) .......... 34

*Gomez v. Stop & Shop Supermarket Co.*,
670 F.3d 395 (1st Cir. 2012) ..................................................... 44

*Grider v. City of Auburn, Ala.*,
618 F.3d 1240 (11th Cir. 2010) ................................24, 28, 45–47

*Heck v. Humphrey*,
512 U.S. 477 (1994) ..............................................................24, 50

*Kelly v. Curtis*,
21 F.3d 1544 (11th Cir. 1994) ............................22, 24, 30, 34, 47

**McMillian v. Johnson*,
88 F.3d 1554 (11th Cir. 1996)
..................................................... 2, 21, 26, 30, 34, 35, 38, 39, 44

*Nelson v. Tompkins*,
89 F.4th 1289 (11th Cir. 2024)................................................. 20

*Owens v. Baltimore City State's Att'y's Off.*,
767 F.3d 379 (4th Cir. 2014) .................................................... 27

**Porter v. White*,
483 F.3d 1294 (11th Cir. 2007)
.............................................. 2, 21, 22, 25–28, 30–34, 38, 39, 42

*Rowe v. City of Fort Lauderdale*,
279 F.3d 1271 (11th Cir. 2002) ..........................................45, 46

*Stardust, 3007 LLC v. City of Brookhaven*,
899 F.3d 1164 (11th Cir. 2018) .................................4, 20, 21, 43

*United States v. Ruiz*,
536 U.S. 622 (2002) ................................................24, 25, 48, 49

*Villasana v. Wilhoit*,
368 F.3d 976 (8th Cir. 2004) .................................................... 27

*Waukegan Potawatomi Casino, LLC v. City of Waukegan*,
128 F.4th 871 (7th Cir. 2025) .................................................... 44

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
792 F.3d 1313 (11th Cir. 2015) ................................................ 34

*Wilkinson v. Dotson*,
544 U.S. 74 (2005) ...................................................................... 50

**Statutes**

42 U.S.C. § 1983 ....................................................... 2, 3, 5, 17

## JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 to adjudicate Talley's 42 U.S.C. § 1983 claims.

This Court has appellate jurisdiction under the collateral-order doctrine and 28 U.S.C. § 1291 because the district court's partial denial of Olinger's motion for summary judgment constituted a denial of qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (plurality op.). This case involves "abstract issue[s] of law related to qualified immunity," including whether the district court failed to apply the correct legal standard for a *Brady*-based § 1983 claim, whether any "federal right allegedly infringed was clearly established," and the scope of the district court's order. *Nelson v. Tompkins*, 89 F.4th 1289, 1296 (11th Cir. 2024) (quotation omitted); *Bayse v. Ward*, 147 F.4th 1304, 1312–13 (11th Cir. 2025) (reversing where district court misapplied summary judgment standard and improperly considered clearly established law). Where an appeal in this posture raises both legal questions and evidentiary issues, this Court has "jurisdiction over both." *Nelson*, 89 F.4th at 1296.

This appeal is timely because the district court's order was entered on September 26, 2025, Doc. 130, and Appellant filed a notice of appeal on October 14, 2025, Doc. 133.

## STATEMENT OF ISSUES

1. Whether the district court erred in denying Olinger summary judgment on Talley's *Brady*-based § 1983 claim where the court failed to consider the claim's causation or mental-state elements, where there is no evidence from which a jury could reasonably infer that Olinger violated his *Brady* duty, and where no clearly established law supports Talley's theory of liability.

2. Whether the district court erred in denying Olinger summary judgment on Talley's § 1983 *Brady* conspiracy claim where there is no evidence that Olinger even knew about a *Brady* violation, much less agreed to commit one, and where no clearly established law supports Talley's theory of liability.

3. Assuming the district court properly denied summary judgment, whether the scope of further proceedings and potential liability must be limited to damages stemming from one of Talley's two trials and must exclude the 13 years Talley served for convictions that have not been vacated.

## INTRODUCTION

The district court denied qualified immunity to a state law enforcement investigator because the court applied the "no-fault standard of care" imposed by *Brady* in the criminal-trial context, rather than the stringent test for individual liability under § 1983. *See Porter v. White*, 483 F.3d 1294, 1305 (11th Cir. 2007). In addition to proof of an underlying *Brady* violation, a § 1983 claim requires proof that the defendant investigator intentionally or recklessly caused that violation. *Id.* at 1307–08. Moreover, an investigator's "duty to disclose" *Brady* material arises only when he lacks "reason to believe that the prosecutor already" has it. *McMillian v. Johnson*, 88 F.3d 1554, 1567 (11th Cir. 1996).

The district court ignored each of those elements and ruled that Georgia Bureau of Investigation agent Roy Olinger could be held individually liable merely because a jury might infer that a *Brady* violation occurred at one of Terry Talley's trials. Beyond that, the court denied qualified immunity without attempting to identify a precedent on the books in 1981 (or today) recognizing its novel triple-bank-shot theory of § 1983 *Brady* liability. The district court's basic errors of law demand review. And this Court should reverse because Olinger is entitled to summary judgment under the correct legal standards.

In the first half of 1981, six women were raped or otherwise assaulted in LaGrange, Georgia. Olinger arrived in mid-July to assist the LaGrange Police Department in the late stages of its investigation. By that point, local detectives including Barbara Price, the "chief investigating officer," had conducted extensive police work. A week after Olinger's arrival, five victims identified Talley, who was later tried for the rape of two victims. Olinger was sworn in as a witness but was sequestered and did not testify. Price, however, testified at both trials and sat at counsel's table "to assist the district attorney." Talley was convicted by both juries and pleaded guilty to the remaining charges for attacks on other victims. Decades later, a state court vacated several of Talley's convictions and ordered his release.

Talley sued LaGrange and various law enforcement officers, including Olinger, seeking damages under 42 U.S.C. § 1983. Among other things, Talley alleged that Olinger failed to share exculpatory evidence with the prosecutor as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and that Olinger conspired to violate Talley's *Brady* rights. The district court denied Olinger's motion for summary judgment on those claims. Doc. 130. In its view, a reasonable juror could find that Price testified falsely at one trial regarding two specific pieces of evidence, and therefore

that the prosecutor must not have known about that evidence. *Id.* at 22–23. Without further explanation, the court concluded that Olinger could be held individually liable at trial. *Id.*

The district court's reasoning is legally indefensible. It did not analyze—or even identify—*any* of the distinct elements of a *Brady*-based § 1983 claim. And under the correct legal rule, the court's logic collapses. The only evidence the court identified as possibly withheld from the prosecutor was collected by Price before Olinger arrived in LaGrange. No gloss on Price's testimony or guesswork about the prosecutor's mindset permits reasonable inferences (1) that Olinger would not have expected local officers to give *Brady* material to the prosecutor; (2) that Olinger caused a *Brady* violation; or (3) that he did so intentionally or recklessly. The district court's contrary conclusion requires (at least) a half-dozen speculative leaps—exactly what summary judgment exists to "demoli[sh]." *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1170 (11th Cir. 2018). Worse still, the court ruled that a jury could find Olinger liable for conspiring with Price to violate *Brady* "because [he] was present for the MK trial, where Price falsely testified." Doc. 130 at 28. But Olinger was sequestered, and zero evidence suggests an agreement to deprive Talley of his rights. This Court should reverse.

## STATEMENT OF THE CASE

Plaintiff-Appellee Terry Talley was convicted in 1981 of raping three women and sexually assaulting three others. *See* Doc. 100-12. In 2021, a court vacated Talley's convictions as to four of those six victims, including all three rape convictions, and ordered Talley's release. Doc. 100-14 at 2–3. Talley sued Georgia Bureau of Investigation agent Olinger, Bureau forensic examiner Benny Blankenship, the City of LaGrange, and four LaGrange police officers under 42 U.S.C. § 1983. Doc. 1. The district court dismissed all claims against the LaGrange officers because they died before Talley filed suit and the time had passed to sue their estates. Doc. 130 at 1 n.1. Olinger died while the case was pending and the court substituted the administrator of his estate as a defendant. *Id.* Olinger and Blankenship moved for summary judgment, asserting qualified immunity. Doc. 100. The district court granted summary judgment to Blankenship on all counts and to the administrator of Olinger's estate on all counts except for Talley's *Brady*-based § 1983 claim (where it found triable disputes relevant to two pieces of evidence and one trial) and his associated conspiracy claim. Doc. 130 at 22–23, 29.

## A. Factual Background

### 1. A series of rapes and attempted rapes occur in LaGrange.

From February through June of 1981, six rapes or attempted rapes were committed in LaGrange, Georgia. On February 7, 1981, LaGrange College student KW was attacked and strangled in her dorm room in an attempted rape. Doc. 100-8 at 12.

On February 21, another LaGrange student, EB, was attacked and raped in her dorm room. Doc. 100-3 at 9. The attacker used a shoestring to choke or tie EB. *Id.*

On April 10, a man entered the home of YS and offered her money for sex. Doc. 100-3 at 33. When YS refused, the man grabbed her by the arm and pushed her into the house, trying to close the door behind them. *Id.* But when YS's son began to cry, the man ran away. *Id.*

On April 19, a man raped 64-year-old MK in her home, using a shoestring to tie her hands. Doc. 100-3 at 12–14. The same man broke into her house about a month later and held her at knifepoint from behind, but fled when MK told him the police were surveilling her house. Doc. 100-10 at 17–22.

On June 24, EM was raped at Southwest LaGrange Baptist Church. Doc. 100-3 at 16. The attacker approached her from

behind, using a shoestring to tie her hands and a knife to cut her clothes off. *Id.* at 20–23.

Finally, on June 30, a man attacked ES in a bathroom at the West Georgia Medical Center but did not rape her after ES said she was menstruating. *Id.* at 22.

#### 2. Georgia Bureau of Investigation agent Olinger assists with the late stages of the investigation.

The LaGrange Police Department investigated the attacks. LaGrange detective Barbara Price was the "chief investigating officer" who was "in charge of going forward with the entire investigation." Doc. 100-10 at 40. Price generally "handle[d] all sex crimes" for the LeGrange police department. Doc. 100-11 at 132. LaGrange detective Otis Furgerson was also involved in the investigation. *See, e.g.*, Doc. 100-10 at 18.

On July 1, 1981, LaGrange's police chief asked the Georgia Bureau of Investigation for assistance, and the Bureau assigned Olinger to the case. Doc. 100-3 at 6–7. Olinger first contacted LaGrange officers on July 14, speaking with the chief of police and detective Furgerson about the attacks on EB, MK, EM, and ES. *Id.* at 7, 9. They told Olinger about the cases, including that the attacker had approached the "victims from behind" and placed "a cord or shoe string around their necks." *Id.* at 7.

On July 16, Olinger met with Price, who filled Olinger in on her investigation in the MK case. Doc. 100-3 at 12. MK had told Price that she recognized the attacker "as being the same black man who had come to her house earlier during the week and wanted to cut the grass." *Id.* The man used a yellow shoestring during the attack. *Id.* at 13–14. Price told Olinger that at the time of the rape, MK "had been drinking quite heavily" and "analysis of her blood revealed her to be .34." *Id.* at 13. Price also told Olinger that she had, on July 1, shown MK a series of photographs, and that MK had identified a man with the initials IPI "as possibly being the man who raped her." *Id.* at 14. (That collection of photographs did not include Terry Talley. *See* Doc. 100-10 at 41.) Price told Olinger that IPI was currently a suspect because he lived within walking distance of the LaGrange College, MK's residence, and the Southwest LaGrange Baptist Church. Doc. 100-3 at 14. She further explained that IPI "drives an ice cream truck and is in business for himself." *Id.*

Price also told Olinger about her investigation of the rape of EM at the LaGrange Southwest Baptist Church. *Id.* at 16–20. The attack occurred around 10:30 am when a man attacked EM from behind while she was working at a copy machine. *Id.* at 16. The attacker initially choked EM with a rope before cutting off her

clothes, blindfolding her, and raping her. *Id.* at 16–17. Several witnesses told Price they had seen a black man in the area around the time of the rape. *Id.* at 17–19. Several also reported having "been approached by a black male wanting to cut their grass." *Id.* at 19. Some identified that person as Charlie Robinson, but he "had been eliminated as a possible suspect" because "he could place his whereabouts during the time of the rape." *Id.* Price explained to Olinger that IPI was a "possible suspect" because he parked his ice cream truck near the church and lived within walking distance. *Id.* at 19. And Price told Olinger that she had questioned IPI, that IPI had a "slight foreign accent, claiming to be Nigerian," and that as "the conversation progressed, his accent became more promin[e]nt." *Id.* at 20.

Apart from receiving briefings on the investigative actions taken by LaGrange detectives before he arrived, Olinger took a few investigative steps of his own. He spoke with Lieutenant Donald Scott about Jack Lovelace, a former LaGrange Officer who had been terminated by the Department in March 1981 based on improper advances he'd made toward female LaGrange students. Doc. 121-10 at 14. Scott told Olinger that Lovelace was with him during EB's rape on the LaGrange campus. *Id.* Olinger also interviewed Verona Maddox, one of the witnesses who had seen a

black male around the church during the time of EM's rape. Olinger showed her a pictorial lineup, which did not include Talley, and Maddox selected IPI as "looking like the man she saw." *Id.* at 15. Olinger also asked an Alabama Bureau of Investigation agent to run a search on IPI, who had an Alabama driver's license. *Id.* at 39. The agent reported that IPI had been arrested for speeding but had no other criminal record. *Id.* Olinger asked the agent for information from IPI's "college professors as to the extent of his accent" and "his behavior patterns while in school." *Id.* The record shows no response. *Id.*

Talley became the focus of the investigation when he went to YS's house on July 21, 1981. Doc. 100-3 at 30. The same day, YS "positively identified Terry Talley" as the man who had come to her house in April offering money for sex and had forced her into her house when she refused. *Id.* at 30, 33. Later that day, Olinger and Price interviewed Talley after he waived his *Miranda* rights. *Id.* at 39. Talley had a white shoestring and knife on him when he was picked up. *Id.* at 41; Doc. 100-11 at 155. When questioned about YS, Talley admitted to having gone to her house, but denied having grabbed her. Doc. 100-3 at 39–40. He also stated that he went door-to-door offering to do yard work and admitted to having gone to MK's house for that purpose. *Id.*

Two days later, Olinger and Price conducted a lineup at the LaGrange Police Department that included Talley. *Id.* at 44. Victims MK, EM, ES, and KW each identified Talley as the man who attacked them, and three of the witnesses in EM's case identified Talley as the man they had seen around the LaGrange Southwest Baptist Church. *Id.* at 43–52. MK's identification was based on sight and Talley's voice. Doc. 100-10 at 23.

Olinger and Price conducted another lineup a week later, on July 29. Doc. 100-3 at 53. Talley chose his number and position, and his defense attorney was present. *Id.* EB identified Talley as the man who raped her. *Id.* Because EB had not seen her attacker, she initially narrowed the lineup down to four men who generally fit the physical traits she had felt when struggling with her attacker. Doc. 100-11 at 125. She then made a positive voice identification, listening to each man repeat the same lines and responding hysterically when Talley spoke. *Id.* at 126, 139.

The Troup County Superior Court issued arrest warrants for Talley for crimes related to all six victims. *See* Doc. 100-8. Detectives Furgerson and Price signed the warrants; Olinger signed none. *Id.*

### 3. A jury convicts Talley in the MK and EM cases.

On September 11, 1981, Talley's defense lawyer, Lee Hasty, filed discovery motions under *Brady* seeking prosecutor Arthur Mallory's files. Doc. 121-26 at 15–18. At a pretrial hearing on Friday, November 6, 1981, Hasty indicated that the State had responded by "fil[ing] all the material they had" earlier that week. Doc. 100-9 at 7. Mallory told the court that "Hasty has seen the entire file and he's welcome to see it again," *id.* at 4; that Mallory's staff had taken Hasty a copy of the "entire file"; and that Hasty had also "received some papers from [Mallory] after that," *id.* at 10. Mallory also indicated that he did "not intend to use" any information he had "not provided to Mr. Hasty." *Id.* at 12.

Talley's trial for the rape of MK was held three days later, on Monday, November 9, 1981. Doc. 100-10. At the outset, Olinger, Furgerson, Price, and MK were sworn in as witnesses. *Id.* at 7. Hasty invoked the rule of sequestration and all witnesses except Detective Price were "required to go to the witness room." *Id.* at 8. Hasty had no objection to Price "remaining in the courtroom to assist the district attorney in the trial." *Id.*

Hasty then raised Talley's *Brady* motion. He told the court that he had received certain documents "ten days in advance of the trial," but that Mallory had also, less than a week before,

"deposited with the Clerk of Court a voluminous packet that contained a number of other materials." *Id.* at 9. Hasty could not access the file until Thursday, November 5; upon examining it, he found "many things … [he] did not know [were] in there." *Id.* The court asked Mallory if he had "furnish[ed] [Hasty] with everything in [Mallory's] file." *Id.* Mallory responded that when the indictment was returned, he lodged Talley's file with the clerk "and advised Mr. Hasty we had the file there." *Id.* at 10. Mallory stated that *Brady* "requires us to furnish him what we plan to use at trial," and when the superior court agreed, Mallory confirmed that he did "not intend to use anything at trial that has not been served on Mr. Hasty ten days prior to the trial." *Id.*

The only trial witnesses were MK and Price. MK identified Talley in court as the person who raped her and later held her at knifepoint. *Id.* at 13–14, 18, 20–21. MK testified that she had identified Talley in the lineup based on his voice and "his body build." *Id.* at 30–31. Hasty asked MK whether "prior to the lineup, [she] saw some photographs," and MK recalled looking at "at least a hundred." *Id.* at 31. Hasty asked if she ever picked Talley "out of any photographs," and MK responded "[n]ot exactly" because her attacker "had on shades" and the photos she saw of men with "shades on didn't look like the" man who attacked her.

*Id.*; *see also id.* at 35. She acknowledged she was not sure whether Talley was the attacker until she "saw him in person, and then [she] knew." *Id.* at 31. Hasty asked MK to review the same photographs Price had used for the pictorial lineup, asking her "which one is Terry Lamar Talley?" *Id.* at 33. MK initially selected a photo of IPI based on "his hair and the shape of his shoulder" and stated that "looking at the picture like that" it was of Talley. *Id.* MK quickly clarified that she "didn't say that was him; [she] said it looked more like him" than the other available photos. *Id.* at 34. Hasty later had MK examine 11 pictures of men wearing sunglasses, and MK identified a different photo as looking like Talley (though it was not him). *Id.* at 38.

Price testified that she was the "chief investigating officer" on the MK case. *Id.* at 40. She testified to showing MK a book with 141 photographs, and that MK could not identify any of them as the defendant. *Id.* at 41. Talley's picture was not in the book. *Id.* According to Price, MK had "never made any identification as a result of those pictures" and the "first time [she] made any identification of the person who raped her was" during the "personal lineup." *Id.* at 41–42. Price also testified that she did not "have any reason to doubt that [MK] was making an accurate and correct identification" at the lineup. *Id.* at 54. She explained

that her confidence was based on her observations of MK immediately after the crime and her conversations with MK after the lineup, as well as all the observations she had made investigating the case and her cumulative experience with rape victims. *Id.* at 55.

The jury convicted Talley of rape and aggravated assault, *id.* at 77, 81, and the court sentenced Talley to life imprisonment for rape and ten years consecutive for assault, *id.* at 80, 82–83.

The trial for EM's rape was held the next day. Doc. 100-11. Olinger was sworn in as a witness but again did not testify. *Id.* at 26. All witnesses except Price were again sequestered. *Id.* at 26–27. Three witnesses testified to having seen Talley in the vicinity of the church around the time of EM's rape. *Id.* at 30, 41, 49. EM also testified. *Id.* at 108. She explained that she had not seen the attacker—who approached from behind and blindfolded her—but that she spoke with him for some time. *Id.* at 116–22. She testified that there was "no way [she] would forget that voice," and that she was able to identify Talley in the lineup based on his voice. *Id.* at 126. Price again testified. *Id.* at 132. Among other things, she testified that as soon as EM heard Talley's voice during the lineup, "she became hysterical." *Id.* at 139. Talley also testified in his own defense. *Id.* at 150.

The jury found Talley guilty of rape and aggravated assault, *id.* at 190, and the court sentenced Talley to life imprisonment for rape and ten years consecutive for aggravated assault, with both sentences to run concurrently with Talley's sentences for his attack on MK, *id.* at 191.

The next day, Talley pleaded guilty to the remaining charges. Doc. 100-13. The court sentenced him to ten years imprisonment for his aggravated assault on ES, *id.* at 6, ten years imprisonment for his aggravated assault on YS, *id.* at 7, ten years imprisonment for his aggravated assault on KW, *id.* at 8, life imprisonment for raping EB, and ten years imprisonment for his aggravated assault on EB, *id.* at 9–10.

**4. Four of Talley's convictions are vacated.**

In 2009, DNA testing excluded Talley as the donor of male DNA in EM's evidence kit. Doc. 100-5 at 2. Eventually, the LaGrange Police Department reinvestigated Talley's case and agreed that certain of his convictions should be vacated. In 2021, the Troup County Superior Court vacated Talley's convictions related to MK, EM, KW, and EB and ordered Talley's release from prison. Doc. 100-14 at 2–4.

Talley's convictions and two concurrent 10-year sentences for the aggravated assaults of YS and ES have not been vacated. *See*

*id.* And in 1988, inmate Talley pleaded guilty to obstruction of a correctional officer, for which he was sentenced to three years imprisonment to run consecutive with his other sentences. Doc. 100-15 at 2. In all, Talley served 13 years in prison for convictions that have not been vacated.

### B. Proceedings Below

After his release, Talley filed this suit against the City of LaGrange, Price, Furgerson, two other LaGrange police officers, Olinger, and Blankenship. Doc. 1 at 11–12. Talley asserted a host of claims under 42 U.S.C. § 1983, challenging several aspects of the investigation and prosecution. The thrust of his case was that the defendants had ignored other suspects, fabricated evidence, concealed exculpatory evidence, destroyed evidence, maliciously prosecuted him, and conspired to violate his rights. *See id.* at 42–62; *see also* Doc. 110 at 48–68.

The district court dismissed Talley's claims against Price and the other LaGrange officers because they had died before Talley filed his complaint and the time for suing their estates had passed. *See* Doc. 65. Talley settled his claims against the City of LaGrange, leaving only Olinger and Blankenship as defendants. Doc. 130 at 1 n.1. In his motion for summary judgment, Olinger asserted qualified immunity and argued that Talley could not

prove a *Brady*-based § 1983 claim, in part because the prosecution and defense case files no longer exist. *See* Doc. 100-1 at 25–26.

The district court granted summary judgment to Blankenship on all claims and to Olinger on all but two: Talley's *Brady*-based § 1983 claim and his related conspiracy claim. Doc. 130 at 29. The court recognized the total lack of "direct evidence [regarding] what information Olinger disclosed." *Id.* at 21–22. But it nonetheless purported to identify "circumstantial evidence from which a jury could conclude that Olinger did not satisfy his *Brady* obligations." *Id.* at 22. Specifically, the court pointed to (1) Price's testimony at MK's trial and (2) an affidavit submitted by Mallory in this litigation stating that "he never knowingly elicited false testimony." *Id.* at 22.

First, the court determined that a reasonable jury could find that Price "falsely testified" when she said she had no reason to doubt MK's identification of Talley, even though MK had a high blood-alcohol level during the attack. *Id.* at 22. Likewise, the jury could deem false Price's testimony that "MK had never identified another suspect" when she had "identified IPI as her possible attacker during a pictorial lineup." *Id.*

Next, the court (implicitly) concluded that a reasonable jury could infer, based on Mallory's affidavit, that he would have

corrected Price's testimony had he known it was false. *Id.* at 22–23. And a jury could further infer, from Mallory's failure to correct Price, that Olinger had withheld the "exculpatory facts" that would have allowed Mallory to do so. *Id.* Based on this inferential chain, the court identified a triable dispute regarding "whether Olinger ever disclosed *this* exculpatory evidence"—*i.e.*, the evidence that would impeach Price's testimony in the MK case—"to the prosecutor." *Id.* at 23 (emphasis added). The court did not identify triable issues on claims that Olinger violated *Brady* in connection with any other trial or evidence.

Turning to Talley's *Brady* conspiracy claim, the court ruled that a reasonable jury could find "Olinger and Price came to an agreement to conceal exculpatory information from Talley." *Id.* at 27. The court reasoned that "Olinger and Price worked together on the investigation, including the in-person lineups that were the backbone of the prosecution's case" and that they "both knew that there were several other suspects." *Id.* at 27–28. The court held that "a factfinder could conclude that Olinger knew that Price, like him, did not disclose the exculpatory information to the prosecutor because Olinger was present for the MK trial, where Price falsely testified." *Id.* at 28. The court did not mention the undisputed fact that Olinger was sequestered during trial.

### C. Standard of Review

This Court reviews "a denial of qualified immunity *de novo* and, on a motion for summary judgment, view[s] the evidence in the light most favorable to the nonmoving party." *Nelson v. Tompkins*, 89 F.4th 1289, 1295 (11th Cir. 2024). Where "abstract issue[s] of law related to qualified immunity" are in dispute on appeal, this Court can "conduct [its] own analysis" of the summary-judgment record under the Rule 56 standard. *Id.* at 1296 (quotation omitted).

"Summary judgment is appropriate when there is 'no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Stardust, 3007*, 899 F.3d at 1170 (quoting Fed. R. Civ. P. 56(a)). "Where the nonmoving party bears the burden of proof at trial," the movant carries his burden on summary judgment "by showing that there is an absence of evidence to support the nonmoving party's case." *Bayse v. Ward*, 147 F.4th 1304, 1312 (11th Cir. 2025) (quotation omitted). The nonmovant must then "come forward with evidence sufficient to withstand a directed verdict motion." *Id.* (quotation omitted). "Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of

summary judgment." *Stardust, 3007*, 899 F.3d at 1170 (quotation omitted).

## SUMMARY OF ARGUMENT

Talley's *Brady*-based § 1983 claims fail as a matter of law, and Olinger is entitled to qualified immunity. In ruling otherwise, the district court committed basic legal errors by applying the wrong test for individual liability and failing to identify a violation of clearly established law.

**I.** Unlike a *Brady* claim in the context of a criminal trial, which merely requires proof that the defense lacked material exculpatory evidence, a *Brady*-based claim for individual liability under § 1983 requires proof that the defendant investigator deprived the plaintiff of his right to a fair trial. *See, e.g.*, *Porter*, 483 F.3d at 1311. To prevail on this claim against Olinger, Talley must prove that his defense attorney did not receive *Brady* evidence, that the prosecutor did not receive it, that Olinger caused the prosecutor not to receive it, that Olinger did so intentionally or recklessly, and that Olinger did not have reason to believe that another officer had provided the evidence to the prosecutor. *See id.*; *McMillian*, 88 F.3d at 1567.

**A.** A reasonable juror could not find any of those things, much less all of them. At the threshold, the record is silent on

what evidence prosecutor Mallory or defense attorney Hasty received because no relevant case files survived the intervening 44 years. But even setting that evidentiary gap aside and assuming Mallory lacked the evidence, nothing links that (hypothetical) failure to Olinger. An officer in Olinger's position—*i.e.*, a state agent assisting local police—would reasonably expect the head local investigator, who sat with the local prosecutor at trial, to share *Brady* evidence with that prosecutor. *See Kelly v. Curtis*, 21 F.3d 1544, 1552 (11th Cir. 1994). Moreover, no evidence suggests that Olinger individually *caused* any *Brady* gap in the prosecutor's file. At a minimum, no jury could find that Olinger acted intentionally or recklessly to deny Talley access to *Brady* material.

Talley's theory appears to be that Olinger *should have known* to independently verify that local detectives met their own *Brady* obligations. But mere negligence is not grounds for § 1983 liability. *Porter*, 483 F.3d 1311. In any event, qualified immunity forecloses this novel theory of liability. No precedent in 1981 (or today) clearly established that Olinger was required to independently confirm that local police had shared everything with the local prosecutor.

**B.** The district court's contrary conclusion is riddled with fundamental legal errors. Most obviously, it failed to consider—or

even mention—several elements of a *Brady*-based § 1983 claim. Instead, the court posited that Price testified falsely about MK's reliability and her prior identification of IPI in a pictorial lineup, and therefore that the prosecutor had not received those two pieces of evidence. Doc. 130 at 23. But even setting aside the court's strained reading of Price's testimony, it has zero bearing on Olinger's individual liability. Price personally gathered the purported *Brady* evidence before Olinger's arrival in LaGrange, and Olinger knew about it only through Price. Under the correct test—with its causation and mental-state elements—there is no way to get from that evidence to § 1983 liability for Olinger.

**II.** Talley's claim that Olinger conspired to violate his *Brady* rights fails as a matter of law because he can prove no underlying *Brady* violation. Thus, the court's failure to apply the correct legal standards to Talley's *Brady* claim infects its conspiracy ruling, too. Regardless, no record evidence indicates that Olinger would have even known about a *Brady* violation, much less that he reached an *agreement* to violate *Brady*. The court thought a jury could find Olinger liable "because [he] was present for the MK trial, where Price falsely testified," Doc. 130 at 28, but Olinger was sequestered. The court's only other basis for conspiracy liability was the fact that Olinger worked with Price. But such "vicarious

co-employee liability" is alien to § 1983—and was certainly not "clearly established" in 1981. *Kelly*, 21 F.3d at 1551.

**III.** If Talley's claims can proceed at all, they are limited in three ways. First, because *Brady* is a trial-specific right, Talley cannot recover for any convictions in which he pleaded guilty. *See United States v. Ruiz*, 536 U.S. 622, 628 (2002). Second, the court's denial of summary judgment was limited to two pieces of evidence relevant to the MK trial, so Talley's surviving claims (and any recovery) are likewise limited. Third, Talley cannot win damages for convictions or sentences that have "*not* been … invalidated." *Heck v. Humphrey*, 512 U.S. 477, 487 (1994).

## ARGUMENT

To overcome qualified immunity, Talley must establish both that Olinger violated his constitutional rights and that binding precedent "clearly established" that Olinger's actions were unconstitutional. *See Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1254 (11th Cir. 2010) (quotation omitted). Talley can do neither, and the district court's contrary conclusion rests on basic legal errors. Most important, it failed to *acknowledge*—let alone *apply*—this Court's demanding standard for holding a law-enforcement officer individually liable under § 1983. With that fundamental legal error corrected, Talley's *Brady*-related damages

claims necessarily fail as a matter of law. At a minimum, qualified immunity applies. This Court should reverse.

## I. Olinger is entitled to summary judgment on Talley's *Brady*-based § 1983 claim.

Under *Brady*, if "favorable, material evidence exclusively in the hands of the prosecution team fails to reach the defense—for whatever reason—and the defendant is subsequently convicted, the prosecution is charged with a *Brady* violation, and the defendant is entitled to a new trial." *Porter*, 483 F.3d at 1305. The *Brady* right is part of the "basic fair trial guarantee" of the Due Process Clause. *Ruiz*, 536 U.S. at 628 (quotation omitted); *Brady*, 373 U.S. at 87 (suppression creates an "unfair trial"). In that context, *Brady* imposes a "no-fault" duty on prosecutors: If the defense does not receive *Brady* evidence—no matter why—the defendant has been denied a fair trial. *Porter*, 483 F.3d at 1305.

This case involves a very different species of *Brady* claim. Talley seeks to hold Olinger—a law-enforcement investigator—individually liable under § 1983 for a prosecutor's alleged failure to provide *Brady* evidence to the defense. This Court has held that "the no-fault standard of care *Brady* imposes on prosecutors in the criminal or habeas context has no place in a § 1983 damages action against a law enforcement official." *Id.* at 1306.

As a result, a plaintiff must prove more than merely an underlying *Brady* violation to prevail. *See id.* at 1307–08. That is true in at least three ways.

*First*, law-enforcement officers are not held to the same *Brady* obligation as prosecutors. Unlike prosecutors, "investigators have no duty to disclose exculpatory and impeachment evidence to the defense." *McMillian*, 88 F.3d at 1567. Instead, investigators "satisfy their obligations under *Brady* when they turn exculpatory and impeachment evidence over to the prosecutor." *Id.* And even that "duty to disclose" does not arise where an investigator "ha[s] reason to believe that the prosecutor *already has* the exculpatory … evidence." *Id.* (emphasis added). Thus, a § 1983 plaintiff must prove not merely that the defense failed to receive *Brady* material, but that the prosecutor failed to receive it—and that the investigator had no "reason to believe" otherwise. *Id.*

*Second*, individual liability under *Brady* and § 1983 requires proof of causation: The defendant law-enforcement officer's "act or omission"—not those of a different state actor—must have "caused the denial of [the plaintiff's] due process right to a fair trial." *Porter*, 483 F.3d at 1307, 1310. That much follows from basic tort principles underlying § 1983 liability. *See id.* at 1306 & n.10 ("In

addition to showing breach and injury," the plaintiff must show that the defendant officer "caused the constitutional deprivation").

*Third*, a § 1983 plaintiff must prove that the defendant officer—when he prevented *Brady* material from reaching the prosecutor—acted with "more than mere negligence." *Id.* at 1311. This Court has not decided whether the defendant must have acted intentionally or whether recklessness is enough. *See id.* at 1308 n.11.[2] Either way, the point is that "the guarantee of due process has historically 'been applied to *deliberate* decisions of government officials.'" *Id.* at 1307 (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)) (emphasis in original). Therefore, "a negligent act or omission cannot provide a basis for liability in

[2] This case does not require an answer because there is no evidence that Olinger acted intentionally *or* recklessly. However, as two Circuits have held, the correct rule is that individual liability under § 1983 and *Brady* requires intent. *See Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004) ("[T]he recovery of § 1983 damages requires proof that a law enforcement officer other than the prosecutor intended to deprive the defendant of a fair trial."); *Owens v. Baltimore City State's Att'y's Off.*, 767 F.3d 379, 396–97 (4th Cir. 2014) (a § 1983 plaintiff must prove that the officer "suppressed the evidence in bad faith"). That rule aligns with this Court and the Supreme Court's recognition that the term "deprive" in the Due Process Clause connotes deliberate action. *See Porter*, 483 F.3d at 1307; *Daniels*, 474 U.S. at 331; *cf. Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988) (bad faith required for loss-of-evidence claim).

a § 1983 action seeking compensation for loss of liberty occasioned by a *Brady* violation." *Porter*, 483 F.3d at 1308.

In sum, to survive summary judgment, Talley must show that a reasonable jury could find that: (1) Talley's defense attorney did not receive identified *Brady* evidence from prosecutor Mallory; (2) Mallory never received that evidence himself; (3) Mallory lacked that evidence because Olinger failed to provide it or otherwise prevented its transmission to Mallory; (4) Olinger did so intentionally or recklessly; and (5) Olinger had no reason to believe that another officer had already provided the evidence to Mallory. Talley does not come close, and the district court could conclude otherwise only by ignoring multiple elements of Talley's claim. Moreover, to avoid qualified immunity, Talley must show that the unconstitutionality of Olinger's actions was "clearly established" as of 1981. *See Grider*, 618 F.3d at 1254. Here, too, Talley falls well short—and here, too, the court below ignored the governing legal standard.

### A. Talley's § 1983 *Brady* claim fails as a matter of law, and qualified immunity bars liability in any event.

**1.** On this record, no reasonable jury could find the elements necessary to hold Olinger individually liable under § 1983 and *Brady*. Talley's failure to substantiate his claim is clearest with

respect to three elements: the existence of an underlying *Brady* violation, causation, and Olinger's mental state.

***Brady* violation.** To start, the record contains no affirmative evidence of any *Brady* violation, much less a violation of Olinger's distinct *Brady* duty as an investigative officer. Crucially, the record is utterly silent on what, if any, *Brady* material prosecutor Mallory may have possessed but failed to share with Talley's defense. Because the prosecutor's files no longer exist 44 years later, there is no way to know their contents. *See* Doc. 100-4 at 4; Doc. 121-1 at 74. Nor is there any evidence about what Mallory learned in discussions with investigators that may not have been memorialized in written notes. Mallory himself averred in this litigation that he does "not recall the criminal cases from 1981 which involved Mr. Terry Talley." Doc. 121-4 at 2. Even if Mallory's files or testimony were available, there would be nothing to compare them to, because defense attorney Hasty's files could not be found, either. Doc. 121-1 at 75.

But even if this evidence *did* exist, and even if it revealed an underlying *Brady* violation at Talley's trial, zero record evidence would link that (hypothetical) gap in Mallory's files to Olinger. And an investigator has "no duty to disclose [*Brady*] evidence" to the prosecutor if he "ha[s] reason to believe that the prosecutor

already is aware of the evidence." *McMillian*, 88 F.3d at 1568. And again, no record evidence supports the inference that "a reasonable officer" in Olinger's position "would not have expected the [prosecutor] to get [the evidence] from another source." *See Kelly*, 21 F.3d at 1552. To the contrary, for reasons explained below, the only plausible inference from this record is that Olinger *would* have reasonably expected LaGrange investigators—including Price, who sat at counsel's table during Talley's trials—to share *Brady* material with Mallory. *See infra* at 31–35.

Without record evidence on any of these dispositive points, Talley cannot possibly carry his burden to show a *Brady* violation. The court should have granted summary judgment based on this point, alone. *See, e.g.*, *Bayse*, 147 F.4th at 1312–13; *Porter*, 483 F.3d at 1306.

**Causation.** Even if Talley could identify a genuine factual dispute on whether Mallory failed to receive certain evidence, and thus to transmit it to Talley's defense, that's only a fraction of the required analysis. Talley must establish that Olinger *caused* that gap in Mallory's files and thus a *Brady* violation. *Porter*, 483 F.3d at 1308. But no record evidence supports that conclusion.

Recall that Olinger was merely assisting the LaGrange Police Department in the late stages of its investigation. By the time

Olinger arrived, all six attacks had occurred, some months before. *See* Doc. 100-3 at 6–7, 9, 12, 16, 22, 30; *see supra* at 6–7. Talley was arrested only a week after Olinger got involved. *See* Doc. 100-3 at 7, 39. Detective Price—the "chief investigating officer" "in charge of … the entire investigation," Doc. 100-10 at 40—had conducted an extensive investigation before Olinger arrived, *see* Doc. 100-3 at 12–20. Olinger's notes consist largely of reports from detectives Price and Furgerson about their work up to that point. *See id.* at 7–20, 28. The notion that Olinger was responsible for a *Brady* gap in Mallory's files regarding the *pre-Olinger* investigation by LaGrange police is the kind of speculation summary judgment exists to eliminate. *See, e.g.*, *Porter*, 483 F.3d at 1311 n.12 (expressing "doubt" that plaintiff "adduced sufficient evidence on causation" where "no evidence suggest[ed] that the misplacement of [*Brady* evidence] occurred in [defendant's] office, rather than in one of the other two").

Indeed, the record confirms that the LaGrange detectives—not Olinger—were involved in Talley's prosecution. Price and Furgerson—not Olinger—signed Talley's arrest warrants. Doc. 100-8. Defense attorney Hasty served a pretrial document subpoena on Furgerson—not Olinger. Doc. 100-9 at 3. Price and Furgerson—not Olinger—testified at Talley's trials. Doc. 100-10

at 39; Doc. 100-11 at 78, 132. Price—not Olinger—"remain[ed] in the courtroom to assist the district attorney in the trial of the case." Doc. 100-10 at 8. And while Olinger's notes reflect his involvement in aspects of the investigation, including the lineups, they do not indicate that Olinger played a meaningful role in Talley's prosecutions. *See* Doc. 100-3 at 6–53. In sum, the record supports one reasonable inference: *local detectives* were responsible for sharing evidence *they collected* with the *local prosecutor*. No evidence links Olinger to any failure to transmit *Brady* material to Mallory. Thus, Talley's claim "fails for lack of causation." *Porter*, 483 F.3d at 1308.

**Mental state.** Finally, the record offers no basis to infer that Olinger intentionally or recklessly withheld *Brady* material from Mallory. *See id.* at 1311. The district court did not even mention this element of a § 1983 *Brady* claim, but it independently confirms Olinger's entitlement to summary judgment.

As discussed, Olinger was a state agent assisting local detectives with a local investigation being prosecuted by a local district attorney. *See supra* at 7–12. Given the absence of evidence that Olinger caused any *Brady* gap in Mallory's files, Talley could not prove that Olinger acted with the requisite mental state. But assuming one *could* concoct an inference of

causation, zero record evidence supports the theory that Olinger's failure to share *Brady* evidence would have amounted to "anything more than mere negligence." *Porter*, 483 F.3d at 1311.

Indeed, the record contains no indication that Olinger knew, or could have known, what evidence was or was not shared with Mallory: Olinger was sequestered from the outset of MK's trial, even before the parties discussed Talley's *Brady* motion. *See* Doc. 100-10 at 7–9. Regardless, the most that can be said about Olinger is that *perhaps* he should have gone behind the local detectives to double-check that Mallory received all evidence. But even assuming Olinger failed to do that (again, the record is silent) that failure would *at most* amount to negligence—*i.e.*, an inference that Olinger *should have known* that the local detectives "charged with the duty to deliver [evidence] to the prosecution" needed babysitting. *See Porter*, 483 F.3d at 1311. The record lacks a shred of "evidence of ill-will or motive on the part of" Olinger, and "absolutely no evidence from which a jury could reasonably infer intent to withhold [or] recklessness." *Id.* at 1311. Thus, Olinger cannot be individually liable under § 1983.

**2.** Qualified immunity separately bars liability. Assuming (against all evidence) that Olinger was individually responsible for a violation of Talley's due-process rights, no law in 1981 "clearly

established" as much. *Id.* at 1302. In 1979, this Court recognized a police officer's general obligation to share *Brady* material with a prosecutor. *See Freeman v. State of Ga.*, 599 F.2d 65, 69 (5th Cir. 1979). But this Court had not even held that "it is the police who violate *Brady,* as opposed to 'the state,' when the police fail to turn exculpatory evidence over to the prosecutor." *McMillian*, 88 F.3d at 1569 n.19.

Beyond that, clearly established law "must not be defined at a high level of generality, but rather be particularized to the facts of the case." *Aguirre v. Seminole Cnty.*, 158 F.4th 1276, 1297 (11th Cir. 2025). Thus, the relevant question is whether binding precedent would have informed Olinger that he needed to *independently confirm* that evidence gathered by local police *before his arrival* had been shared with the local prosecutor. No such precedent existed in 1981—or today. Indeed, this Court's cases foreclose individual liability in that scenario. *See Kelly*, 21 F.3d at 1552; *McMillian*, 88 F.3d at 1567. Plus, that kind of novel, pseudo-supervisory liability for a non-supervisory state agent assisting a local investigation would violate basic § 1983 principles. *Cf. Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1328 (11th Cir. 2015) (vicarious liability is not a basis for § 1983 liability). It was certainly unknown in 1981.

In sum, it would have been reasonable for Olinger to conclude that the local detectives—including Price, who was "in charge of … the entire investigation," Doc. 100-10 at 40—would handle the task of transmitting all material evidence to Mallory. That is especially true of evidence *those detectives* personally gathered before Olinger arrived on the scene. Indeed, the record confirms that the responsibility to assist Mallory belonged to Price, not Olinger. *See* Doc. 100-10 at 8. On these facts, no case from the Supreme Court or this Court in 1981 would have put Olinger on notice of an independent "duty to disclose the evidence" himself. *See McMillian*, 88 F.3d at 1567. Whether on the merits or qualified immunity, Olinger is entitled to summary judgment.

**B. The district court's contrary reasoning fails.**

Nevertheless, the court below concluded that Talley may proceed to trial on his *Brady*-based § 1983 claim as applied to Talley's trial for the rape of MK. *See* Doc. 130 at 23. But the district court's ruling rests on a fundamental legal error: its failure to acknowledge, much less apply, this Court's stringent test for individual § 1983 damages liability, as opposed to the "no-fault" *Brady* standard that applies in the trial context. Indeed, its order does not even *mention* the causation or mental-state

elements of Talley's § 1983 claim. And the court's analysis only confirms that (at least) those elements fail as a matter of law.

**1.** The district court's reasoning—to the extent it can be gleaned from the order—requires some explanation. To start, the court's ruling applied only to specified evidence relevant to Terry's trial for the rape of MK. In particular, the court concluded that a jury could find that Mallory had not received two pieces of exculpatory evidence: MK's blood-alcohol level during her assault and her pictorial identification of IPI. Doc. 130 at 22–23 (finding "a genuine factual dispute" on "whether Olinger ever disclosed *this* exculpatory evidence to the prosecutor") (emphasis added).

Crucially, however, the district court did not derive that "genuine factual dispute" from record evidence of *Olinger's* acts or omissions. *Id.* Instead, it relied on a chain of inferences extracted from *Price's* testimony. At the MK trial, Price testified (under questioning from Mallory) that she had no "reason to think MK could not accurately identify her attacker" and "that MK never identified another suspect" during the pictorial lineup. Doc. 130 at 22. But, because MK was intoxicated during the attack and had identified IPI, "[a] juror could find that Price falsely testified." *Id.* The court then pointed to Mallory's affidavit stating that "he never knowingly elicited false testimony" and that "if law

enforcement officer testified falsely at Talley's trials, they did so without [Mallory's] knowledge." *Id.* at 22–23. While the court did not spell out its logic, it apparently inferred that Mallory was unaware of the evidence that arguably contradicted Price's testimony. Finally, the court announced—without explanation—that a reasonable juror could find that "Olinger did not disclose these exculpatory facts to the prosecutor and … thus failed to meet his *Brady* obligations." *Id.* at 23. The court stopped there, reflecting a legal assumption that a dispute over Olinger's *Brady* compliance—without more—was sufficient for a trial on Olinger's individual liability under § 1983.

**2.** That assumption is wrong: Even if Talley could prove that Olinger failed to turn over *Brady* material to Mallory (*but see* Part I.A.1, *supra*), that would not carry Talley's burden under § 1983 and this Court's decisions in *McMillan* and *Porter*. Instead, to survive summary judgment, Talley *also* needed to establish genuine factual disputes on causation and Olinger's mental state. But the court did not even mention those requirements, let alone apply them. Indeed, its logic is irreconcilable with either element. Because *Mallory* might not have known about certain exculpatory evidence, the court reasoned, a reasonable juror could find *Olinger* liable. But that inferential leap only makes sense under the "no-

fault standard of care" this Court has expressly rejected in the context of "a § 1983 damages action against a law enforcement official." *Porter*, 483 F.3d at 1306.

Nor did the district court consider whether a jury could find that Olinger lacked "reason to believe that [Mallory] already ha[d]" the relevant *Brady* evidence—a prerequisite to concluding that Olinger had a "duty to disclose." *McMillian*, 88 F.3d at 1567. That failure is inexcusable: On this record, no juror could find that Olinger understood that he was the sole conduit to Mallory for evidence gathered *prior to his involvement* by local detectives *directly assisting* Mallory's prosecution. *See supra* at 28–35.

These legal errors are evident from the court's analysis. It relied exclusively on MK's blood-alcohol level and her pictorial identification of IPI, identifying no other evidence as even possibly withheld from Mallory. Doc. 130 at 22–23. But neither piece of evidence could expose Olinger to § 1983 liability, because both were derived from Price's investigation before Olinger even began assisting the LaGrange police. The notion that Olinger would have been expected to tell Mallory about someone else's earlier investigative steps—especially when that someone was the lead investigator who assisted Mallory at trial—defies the record and common sense. So does the court's implicit assumption that

Olinger would not have relied on Price or another LaGrange officer to share the Department's own evidence with the local prosecutor. *See McMillian*, 88 F.3d at 1567. More still, that the district court's summary-judgment analysis rests entirely on evidence that Olinger himself did not even obtain (and that predated his involvement in the case) just proves the dispositive point: There is no evidence that Olinger acted intentionally or recklessly to deny evidence to Mallory and due process to Talley. Even if Olinger should have known to independently share this evidence, that is not enough. *See Porter*, 483 F.3d at 1311.

Rounding out its legal errors, the court also incorrectly applied the clearly-established-law prong of qualified immunity, relying *solely* on the bare existence of an investigator's *Brady* duty. *See* Doc. 130 at 21. But again, that is not the question. *See supra* at 25–28, 34; *Aguirre*, 158 F.4th at 1297. As it stands, the court's reasoning would impose on every investigative officer an unprecedented duty to independently debrief the prosecutor on all material evidence—even evidence gathered prior to his involvement by others directly assisting the prosecutor. That duty was certainly not clearly established in 1981, and this Court should not upend its § 1983 jurisprudence to establish it now. *See, e.g.*, *McMillian*, 88 F.3d at 1567; *Porter*, 483 F.3d at 1305–08.

**3.** The district court's glaring legal errors provide reason enough to reverse. But if more were somehow needed, the court's reasoning fails on its own terms. Boiled down, the court's logic was that because Mallory would not have elicited false testimony, and because Price testified falsely, Mallory must not have known about the contradictory evidence. Doc. 130 at 22–23. But that reasoning is speculative: A juror could not draw a reasonable inference of Mallory's ignorance from his questions to Price or his failure to clarify her testimony, nor could it reasonably infer that Mallory's ignorance was the product of never *receiving* evidence, as opposed to forgetting or overlooking it.

The district court reasoned that Price's testimony could be deemed false because Price knew that MK was intoxicated at the time of the assault but testified that she had no reason to doubt MK's ability to identify her attacker. *See id.* at 22. But Price's actual testimony was holistic: Based on all of Price's observations of and conversations with MK, plus her prior experience with rape victims, Price did not doubt MK's identification. *See* Doc. 100-10 at 54–55. While MK's blood-alcohol content might have provided grounds to question Price's conclusion or credibility, Mallory's questions elicited an open-ended opinion. *See id.* No evidence suggests that Price did not actually hold the opinion she expressed

or that Mallory disagreed with Price's bottom line. And none of this means that Mallory was *ignorant* of MK's blood-alcohol content when questioning Price. While the district court did not explain this point, it must have concluded that Mallory would have impeached his own witness had he been aware of that evidence. But Mallory's failure to follow up is entirely consistent with the open-ended nature of his question—the extra-record leap required to infer Mallory's ignorance is simply too large for summary judgment. And even that speculative jump would not go far enough, because Mallory could have simply forgotten or overlooked the blood-alcohol evidence after receiving it.

Price also testified that MK "never made any identification as a result of" the pictorial lineup and that the first time MK "made any identification of the person who raped her" was at the in-person lineup. Doc. 100-10 at 41–42. At the pictorial lineup, MK had identified a photograph of IPI "as *possibly* being the man who raped her." Doc. 100-3 at 14 (emphasis added). Price was walking a fine line in testifying that MK had not *positively* identified anyone until the lineup because MK's selection of IPI's photograph was noncommittal. But again, there is no evidence that Mallory did not share that understanding of Price's hedged testimony. And while MK's preliminary identification IPI may have been a

basis to impeach Price, that Mallory chose not to do so *himself* is an astonishingly thin reed on which to rest liability for Olinger.

Besides, the district court relied on Mallory's affidavit stating he "never knowingly elicited false testimony." Doc. 121-4 at 2. And there is a difference between *knowingly* eliciting false testimony and *inadvertently* doing so. Even assuming Price lied, that does not add up to Mallory's ignorance of the alleged *Brady* material. Again, nothing in the form or substance of Mallory's questions *invited* false answers, and his affidavit does not address how he would handle an after-the-fact realization that Price's answers were false. And because Mallory does not remember the case, neither party can produce his testimony on the issue. At trial, the jury would be invited to speculate whether Mallory lacked the evidence; whether he had it but chose not to clarify Price's debatable—but not clearly false—testimony; or whether Mallory received the evidence but simply overlooked it at trial. But summary judgment is designed precisely to prevent such rank speculation. *See Bayse*, 147 F.4th at 1313.

**4.** Stepping back, the court's focus on nitpicking *Price's* testimony, rather than anything *Olinger* did, tells this Court all it needs to know: This record does not allow Talley to prove *anything* about Olinger's actions—much less his "ill-will or motive." *Porter*,

483 F.3d at 1311. The court could deny summary judgment only by ignoring the correct legal standard and by ignoring the lack of clearly established law.

Under the correct legal standard, Olinger is entitled to summary judgment. Summary judgment exists to ensure that a plaintiff's case rests on reasonable inferences from hard evidence; "unsupported speculation does not meet [that] burden." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (cleaned up). To find Olinger liable, a jury would have to indulge a cascade of "speculative reasoning." *Stardust, 3007*, 899 F.3d at 1175.

*First*, a jury would need to infer that Price's testimony was, in fact, "false" and not merely a contestable opinion or the product of fine distinctions. *Second*, it would need to infer that, had Mallory known about the *Brady* material, Mallory would have concluded that Price's testimony was indeed false. *Third*, it would need to infer that, had Mallory known Price's testimony to be false, he would have proactively impeached his witness or asked different questions. *Fourth*, it would need to infer that Mallory's ignorance of MK's blood-alcohol level and identification of IPI arose because Mallory never received the evidence—not because Mallory had overlooked or otherwise forgotten it. (Even after these four inferences, Olinger remains out of the picture.) *Fifth*, the jury

would need to infer that Olinger had no "reason to believe" that Price or another LaGrange officer would have shared the evidence with Mallory. *See McMillian*, 88 F.3d at 1567. *Sixth*, it would need to infer that Olinger knew that Price or another LaGrange officer had not shared the evidence with Mallory and either stayed silent or somehow prevented Price or another officer from doing so. *Seventh*, it would need to infer that Olinger's failure to independently debrief Mallory about evidence collected by Price before Olinger arrived amounted to an intentional or reckless decision to violate Talley's rights.

There is hardly evidence to support any one of those leaps, much less the whole seven-car "inferential pileup." *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 878 (7th Cir. 2025). The district court's (largely unstated) rationale—defensible only under an erroneous understanding of the elements of a *Brady*-based § 1983 claim—"piles inference upon inference until the entire pyramid topples of its own weight." *Gomez v. Stop & Shop Supermarket Co.*, 670 F.3d 395, 398 (1st Cir. 2012). Even if that pyramid could stand, it would crumble under the added demands of qualified immunity and the lack of any clearly established law. This Court should reverse.

## II. Olinger is entitled to summary judgment on Talley's § 1983 conspiracy claim.

To prove his conspiracy claim, Talley "must show that an agreement between two or more people (at least one of whom is a state actor) to violate his constitutional rights resulted in an actual violation of those rights." *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1191 (11th Cir. 2011) (*AFL-CIO*). He "must prove the defendants reached an understanding to violate [his] constitutional rights." *Grider*, 618 F.3d at 1260 (quotation omitted). And he must do so with more than a "mere scintilla of evidence." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1284 (11th Cir. 2002) (quotations omitted). He cannot, as a matter of law.

To start, because Talley's underlying *Brady*-based claim against Olinger fails, *see* Part I, *supra*, his conspiracy claim fails, too. *See, e.g.*, *Corey Airport Servs., Inc. v. Decosta*, 587 F.3d 1280, 1288 (11th Cir. 2009) (where no rights violation occurs, a § 1983 defendant is entitled to qualified immunity on the substantive claim and the related "conspiracy claim"). Thus, the court's legal errors under *Brady* infect its conspiracy ruling.

Moreover, no factfinder could conclude that Olinger "reached an understanding" with *anyone* to withhold *Brady* evidence. *See Grider*, 618 F.3d at 1260 (quotation omitted). Again, no jury could

reasonably infer that Olinger violated his *Brady*-adjacent duty *at all*; the notion that Olinger knew (or would have known) that someone else violated his or her own *Brady* obligations is pure speculation. *See supra* at 28–35. In short, there is no genuine dispute regarding the existence of an "agreement" to violate Talley's due-process rights. *See AFL-CIO*, 637 F.3d at 1191.

Nevertheless, the district court concluded that a reasonable jury could find that "Olinger and Price came to an agreement to conceal exculpatory information from Talley" because (1) they "worked together on the investigation" and (2) Olinger "was present for the MK trial, where Price falsely testified." Doc. 130 at 27–28. But the court's first premise proves nothing, and its second is demonstrably false.

First, the fact that Olinger and Price worked together does not constitute even a "scintilla of evidence" that they conspired to violate Talley's rights. *See Rowe*, 279 F.3d at 1284 (quotation omitted). As this Court has explained in a similar context, "showing that [two officers] 'conspired' to investigate [an incident], which is lawful and part of their duties as … officers, is a far cry from showing that [they] agreed to fabricate, and then maliciously prosecute" someone. *Grider*, 618 F.3d at 1260. Holding an officer individually liable merely for cooperating on a case that involves

constitutional errors would recognize a kind of "vicarious co-employee liability" based on imputed or collective knowledge alien to § 1983—both in 1981 and today. *Kelly*, 21 F.3d at 1551 ("There is no authority for imputing to those two detectives the knowledge and alleged culpability of another detective; the law did not then, and does not now, clearly establish such vicarious co-employee liability."); *see also Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). It certainly makes no sense in a conspiracy claim, which requires the defendant to have *agreed* to violate someone's rights, not merely to work alongside an officer who did. *See Grider*, 618 F.3d at 1260. Thus, the district court's analysis of this claim is badly wrong and flouts the clearly-established-law prong of qualified immunity.

To bolster its analysis, the court posited that "Olinger *knew* that Price, like him, did not disclose the exculpatory information to the prosecutor *because* Olinger was present for the MK trial, where Price falsely testified." Doc. 130 at 28 (emphases added). Setting aside the myriad unreasonable assumptions embedded in that sentence, *see* Part I, *supra*, its "because" clause is untrue: Olinger was sequestered from the outset of the MK trial, so he did not hear Price's testimony. *See* Doc. 100-10 at 7–8. Even if Olinger *had* heard Price's testimony, that would be woefully

insufficient for conspiracy liability. But it is telling that the *only* "evidence" the court could identify that suggests illicit coordination between Price and Olinger *does not exist*. This Court should reverse on the conspiracy claim, too.

### III. If this Court affirms, it should clarify the narrow scope of Talley's surviving § 1983 claims.

If the district court's order survives at all—and it should not—this Court should clarify its limited scope in three ways. *First*, Talley cannot secure damages stemming from convictions in which he entered guilty pleas. *Second*, the court's denial of summary judgment—and thus, the scope of any trial—is limited to the *Brady* violation that (purportedly) occurred at the MK trial. *Third*, Talley cannot recover damages for the 13 years he spent in prison for convictions that have not been vacated.

**1.** Pleading guilty to an offense takes *Brady*-based § 1983 liability off the table. *Brady* is a component of the Constitution's "basic fair trial guarantee." *Ruiz*, 536 U.S. at 628. And when "a defendant pleads guilty," he "forgoes not only a fair trial, but also other accompanying constitutional guarantees." *Id.* at 628–29. The only constitutional question at the plea stage is voluntariness. *See id.* And the Supreme Court made clear in *Ruiz* that the Constitution "does not" mandate the "preguilty plea disclosure of

impeachment information." *Id.* at 629. Distinguishing *Brady* concerns, the Court explained that "impeachment information is special in relation to the *fairness of a trial,* not in respect to whether a plea is *voluntary*." *Id.* (emphasis in original). Similarly, the Court noted that the challenged "'fast track' plea agreement" required defendants to "waive the right to receive information the Government has regarding any 'affirmative defense.'" *Id.* at 633. But "the need for this information is more closely related to the *fairness* of a trial than to the *voluntariness* of the plea." *Id.* (emphasis in original).

Talley's § 1983 claims have nothing to do with whether his pleas were voluntary. Instead, he asserts that the defendants denied him a fair trial under *Brady*. As such, Talley cannot recover damages stemming from any convictions that resulted from guilty pleas. At a minimum, qualified immunity would bar any *Brady*-based claim connected to a guilty plea. No law in 1981 (or today) clearly established a *Brady* duty arising outside the trial context. *See, e.g.*, *Alvarez v. City of Brownsville*, 904 F.3d 382, 394 (5th Cir. 2018) (concluding that "case law from the Supreme Court, this circuit, and other circuits does not affirmatively establish that a constitutional violation occurs when *Brady* material is not shared during the plea bargaining process").

**2.** Moreover, given the record and the court's reasoning, Talley's *Brady*-based § 1983 claims can proceed *only* with respect to his trial for the rape of MK. As discussed, the court ruled that a reasonable juror could conclude that only two pieces of evidence were withheld from the prosecutor (and thus, Talley): MK's blood-alcohol level and her pictorial identification of IPI. *See supra* at 36–37. The court identified no other triable *Brady* issue, and none exists. Again, *Brady* is a trial-specific right, *see supra* at 25, 48–49, and the only trial relevant to Talley's surviving § 1983 claims is the one at which he was convicted of raping MK. Thus, if Talley's claims proceed at all, this Court should clarify their limited scope for purposes of trial and damages.

**3.** Talley's surviving claims and potential recovery are limited for yet another reason: Talley served 13 years in prison for convictions that have not been vacated. *See supra* at 16–17. Talley cannot recover for that period of incarceration because a "claim for damages" based on "a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983." *Heck*, 512 U.S. at 487 (emphasis in original); *see also Wilkinson v. Dotson*, 544 U.S. 74, 81–82 (2005). Talley served his vacated sentences concurrently with his extant ones, so even assuming Talley could prevail at trial, 13 years of his prison term remains

attributable to valid convictions. As a result, there is no way for Talley to prove causation for any injury caused by those 13 years in prison.

Of course, this Court need not reach these issues because the district court's denial of summary judgment was legally erroneous and should be reversed. But if this Court affirms, it should clarify that Talley's surviving claims are limited to the MK trial and that 13 years of his incarceration are off limits under § 1983.

## CONCLUSION

For the reasons set out above, this Court should reverse the judgment of the district court.

Respectfully submitted.

/s/ *John Henry Thompson*

Christopher M. Carr
*Attorney General of Georgia*

Stephen J. Petrany
*Solicitor General*

John Henry Thompson
*Director of Special Litigation*

Elijah O'Kelley
*Deputy Solicitor General*

Loretta L. Pinkston-Pope
*Deputy Attorney General*

William W. Peters
*Senior Asst. Attorney General*

Office of the Georgia Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3373
jhthompson@law.ga.gov
*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 11,159 words as counted by the word-processing system used to prepare the document.

/s/ *John Henry Thompson*
John Henry Thompson

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2025, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *John Henry Thompson*
John Henry Thompson